Gabriel "Steve" MARRE,
Contestant–Respondent,

v.

Ronald Francis REED,
Contestee–Appellant.

No. 71235.

Supreme Court of Missouri,
En Banc.

Sept. 8, 1989.

Jonathan L. Downard, Union, for contestee-appellant.

Frank K. Carlson, Union, for contestant-respondent.

RENDLEN, Judge:

Contestee Ronald Francis Reed appeals from a judgment ordering a new election after contestant Marre successfully challenged the correctness of returns for the April 5, 1988 election for the office of Marshal of the City of Pacific pursuant to § 115.553.1, RSMo 1986. The Court of Appeals, Eastern District, reversed the trial

court's judgment, citing *Whitener v. Turnbeau,* 602 S.W.2d 890 (Mo.App.1980). Here, on transfer, the case is decided as though on original appeal. Mo. Const. art. V, § 10. We affirm.

The City of Pacific is located in the Counties of Franklin and St. Louis, and the election authorities of those counties certified that Reed, the incumbent, received 434 votes to Marre's 423 in the April 5, 1988 election for marshal. Marre's timely challenge, filed April 22, 1988,[1] in the Circuit Court of Franklin County, alleged various irregularities in the election, including the participation of "[a]t least fourteen (14) people who were not qualified to vote in the municipal elections in Pacific [but] were registered and allowed to vote...." Following an evidentiary hearing, the trial court found "irregularities of sufficient magnitude to cast doubt on the validity of the election" and ordered a new election for the contested office. The court further stated that the irregularities necessitating the order "consist[ed] solely of votes cast by persons in the initial election who were not qualified to vote therein[,]" and listed the names of eleven voters found to be ineligible. The court of appeals reversed, holding that voter qualifications may not be challenged under § 115.553.1, RSMo 1986.

On appeal, Reed asserts the trial court erred in considering the qualifications of voters in this proceeding. In reviewing the judgment, we are mindful that the decision of the trial court must be affirmed unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Barks v. Turnbeau,* 573 S.W.2d 677, 679 (Mo.App.1978). This Court recently discussed the importance of Chapter 115, RSMo, noting:

> A general election contest challenges the validity of the very process by which we govern ourselves; it alleges that through an irregularity in the conduct of

an election, the officially announced winner did not receive the votes of a majority of the electorate. That the General Assembly need not permit election contests is beyond cavil. But by allowing election contests, the General Assembly has determined that the accuracy of election results is a matter of significant importance to our democratic process.

> If as a result of election irregularities the wrong candidate is declared the winner, more is at stake than the losing candidate's disappointment; the people have lost the ability to impose their will through the electoral process. Thus to claim that a general election contest is no more than an adversary proceeding between a losing candidate and the officially announced winner is to misunderstand the *raison d'etre* of election contests and to discount the importance the legislature has placed on accuracy in elections. An election contest ... is an action by which the contestant challenges the conduct of the election itself. In bringing an election contest, the contestant speaks for the entire electorate, seeking to assure all that the democratic process has functioned properly and that the voters' will is done.

*Foster v. Evert,* 751 S.W.2d 42, 43–44 (Mo. banc 1988).

Against this background we examine the specific sections of Chapter 115 implicated here. Section 115.553.1 provides:

> Any candidate for election to any office may challenge the correctness of the returns for the office, charging that *irregularities* occurred in the election.

(Emphasis ours.) Section 115.593 states in pertinent part:

> **New election ordered, when.**—If the court ... determines there were *irregularities of sufficient magnitude to cast doubt on the validity of the initial election,* it may order a new election for the contested office or on the contested question....

(Emphasis ours.)

■ The term "irregularities," utilized in both § 115.553.1 and § 115.593, is not spe-

---

**1.** *See* § 115.557, RSMo 1986, which requires that election contests pursuant to § 115.553 be

filed not later than thirty days after announcement of the election results.

cifically defined in Chapter 115. The court of appeals concluded improper qualification of a voter is not an "irregularity" within the meaning of the contest statutes, relying principally on *Whitener*, 602 S.W.2d at 890. In that case, decided shortly after enactment of the Comprehensive Election Act of 1977, the court of appeals held that qualifications of voters may not be "collaterally" attacked in a contest proceeding, finding *Kramer v. Dodson*, 543 S.W.2d 792 (Mo.App.1976), still viable although decided prior to the 1977 revision of the election statutes. In so doing the court noted that, like the statute in *Kramer*, Chapter 115 contains a comprehensive scheme for purging voter registration rolls prior to elections, and reasoned that "an attack on voter qualifications should be made at the polls in accordance with statute, and ... judicial attack is impermissible." *Id.* at 893.

In that respect *Kramer* and *Whitener* place great stock on quick and certain resolution of election contests as against the quest for fair and accurate results. This is contrary to the determination of the General Assembly, reflected in Chapter 115 and discussed in *Foster*, 751 S.W.2d at 43, that "the accuracy of election results is a matter of significant importance to our democratic process." *Id.* *Kramer* and *Whitener* do not analyze the impact of voting by those not qualified to cast a ballot on the accuracy of reported election results, nor do they discuss its significance as an "irregularity"; rather, they conclude that challenges to voter qualification should be made prior to the election. However, ballots cast by those who are not qualified to vote contaminate the reported results and if such votes cannot be challenged in an election contest then the election contest will not "assure all that the democratic process has functioned properly and that the voters' will is done."[2] *Foster*, 751

S.W.2d at 44. Thus, to that extent *Kramer* and *Whitener* are contrary to the spirit of Chapter 115 and this Court's decision in *Foster*, and they do not control the question presented here.

■ We need not base our resolution of this issue, however, solely on such matters of policy. Section 115.585.2, which is not mentioned in the *Kramer* or *Whitener* opinions, provides a more specific statutory basis for concluding "irregularities," as used in the election contest statutes, encompasses votes cast by unqualified voters. That section provides:

2. Whenever a recount is ordered pursuant to section 115.583 or 115.601, the court or legislative body shall have authority to pass upon the form and determine the legality of the votes brought into question *and to determine the qualifications of any voter whose vote is brought into question*, provided that the name of a voter upon a precinct register for the polling place shall be prima facie evidence of the proper qualifications of the voter.... No votes of any person found by the court to be unqualified to vote at the election shall be counted.

(Emphasis ours.) While this section pertains to recounts, and not specifically to § 115.593, involving new elections, it refutes the argument that voter qualifications must be challenged prior to the election.[3] Furthermore, § 115.583, like § 115.593, refers to "irregularities." Related clauses are to be considered when construing a particular portion of a statute, *State v. Campbell*, 564 S.W.2d 867, 869 (Mo. banc 1978), and we believe that the term "irregularities" has essentially the same meaning in § 115.583 as it does in § 115.593. Because voting by unqualified voters is an irregularity examined by the court in conducting a recount, it follows that such an irregularity may be considered

2. We note this case does not present any question pertaining to voters whom election authorities prohibited from casting ballots.

3. Section 115.585.2 would seem to contradict the statement contained on p. 5 of the dissenting opinion of Higgins, J., that: "Voter qualifications, however, are not irregularities that may be discovered during a recount."

in determining whether a new election should be ordered. *Whitener* and *Kramer*, to the extent they are inconsistent with this conclusion, should not be followed.

■ Having found that the trial court acted within its statutory authority when scrutinizing the qualifications of voters in this proceeding, we turn to the question of whether there are "irregularities of sufficient magnitude to *cast doubt* on the validity of the initial election (emphasis added)," § 115.593, when a number of voters are found to be disqualified and that number equals or exceeds the margin of the apparent victor. This requires an examination of the statutory language to determine the legislative intent.

The "new election" statute provides a new election may be ordered when "there were *irregularities of sufficient magnitude to cast doubt* on the validity of the initial election (emphasis added)." § 115.593. The "recount" statute contains similar language: if "there is a *prima facie showing of irregularities* which place the result of any contested election *in doubt* (emphasis added)," a recount of the votes may be ordered. § 115.583. The latter section declares that "[w]here the issue is drawn over the validity of certain votes cast, *a prima facie case is made if the validity of a number of votes equal to or greater than the margin of defeat is placed in doubt* (emphasis added)." Without question the legislature intended that when the validity of a number of votes equal to or greater than the margin of defeat is placed in doubt, then the election result is cast in doubt and a *prima facie* case is made justifying a recount under § 115.583. By the same token such finding constitutes "irregularities of sufficient magnitude to cast doubt on the validity of the initial election" justifying a new election under § 115.593. Both statutes require that a showing of irregularities place the result of the election *in doubt.* These statutes, *in pari materia,* are clearly in harmony and readily bespeak the showing necessary to justify the remedy authorized therein.

■ The trial court's judgment that eleven voters were disqualified must be affirmed unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). Applying the *Murphy* standard we find the trial court's judgment is supported by the evidence and properly applies the law as to voter qualifications.

In making this finding, several constitutional and statutory provisions are considered. The Missouri Constitution mandates that voters be "over the age of eighteen," "residents of this state and of the political subdivision in which they offer to vote," and "registered within the time prescribed by law." Mo. Const. art. VIII, § 2. Section 115.133.1, the statutory section on voter qualifications, states that the voter must be "eighteen years of age or older" and a Missouri resident. Section 115.135.1 provides that persons qualified to vote are entitled to register in the jurisdictions in which they reside and must have been so registered not later than the fourth Wednesday prior to the election. Section 115.137.1 states that all persons who are entitled to register and vote are entitled to vote in all public elections held for "political subdivisions" within which they reside; however, as declared in § 115.139, one who is not "registered in accordance with this subchapter" shall not be permitted to vote. In addition to these residency and registration requirements, "[a]ny registered voter who *changes his place of residence* within a county at or before 5:00 p.m. on the fourth Wednesday prior to an election *and does not transfer his registration* at or before 5:00 p.m. on the fourth Wednesday prior to the election *shall not be entitled to vote in the election* (emphasis added)." § 115.165.5.

■ "Residence" for purposes of voter qualifications is subject to the common law tests normally invoked when determining domicile, and thus becomes a "question of fact to be determined from the acts and

intentions of the individual citizen." *Barrett v. Parks*, 180 S.W.2d 665, 666 (Mo. 1944). "[I]f there exists a discrepancy between declarations of intention and acts, the declarations yield to the conclusion to be drawn from the acts." *Id.* Though "an actual residence, coupled with the intention to remain either permanently or for an indefinite time, without any fixed or certain purpose to return to the former place of abode, is sufficient to work a change of domicile," *Chomeau v. Roth*, 230 Mo.App. 709, 72 S.W.2d 997, 999 (1934), "[w]here the facts are conflicting, the presumption is strongly in favor of an original or former domicile as against an acquired one." *Barks v. Turnbeau*, 573 S.W.2d at 679–80 (quoting *State ex rel. Walsh v. King*, 484 S.W.2d 641, 645 (Mo. banc 1972)). "Even absence from an individual's residence for relatively long periods of time does not mean an abandonment of that residence where the intent to return exists." *Id.* at 680.

As to nine of the voters listed in the trial court's judgment, we have no doubt that they were properly found to be disqualified.[4] As to the residence of a tenth, Larry Littmann, conflicting evidence was presented and the standards of review in this court-tried case call for deference to the trial court's findings of facts and especially as to questions of the witnesses' credibility. Littmann testified that he moved to his mother's home in Pacific, where he was registered, a few months before the election, but then bought a trailer outside of town in March 1988 and was in the process of moving at the time of the election on April 5th. At one point he stated his trailer wasn't fully hooked up until April 15th, but he had a telephone number there in March and admitted living there on April 5th (he later changed his testimony). With deference to the trial court's determination of the credibility of the witnesses it cannot be said there was no substantial evidence to support the deci-

sion that Littmann was a nonresident of Pacific.

As to one other voter, Greg Rulon, a closer question is presented. Rulon testified that his permanent residence and mailing address for twenty years had been his parents' home in Pacific, where he was registered to vote. However, he had a "speculation home" outside of town which he claimed to have built solely as an investment for resale. He testified that though the home was fully furnished, this was only for the purpose of resale and he worked there and stayed overnight for periods of time, such as the three days before the election. He had phone listings at both places and the server of the subpoena testified that he found Rulon at the out-of-town address. This evidence raises a substantial question whether Rulon's actions were really inconsistent with his stated intent to retain his residence at his parents' home in Pacific.

■ However, assuming *arguendo* the trial court was incorrect as to Rulon, there is another voter, Donald Lee, who though not specifically listed as disqualified, is clearly shown so to be by the record. Although Lee testified that he resided at his parents' home in Pacific at the time of the election and was registered to vote at this address, he admitted that at the time of registration in November 1987 he lived in an apartment outside the city, where he continued to live until March 1988. This registration was improper under the relevant statutes. Section 115.135.1 states that persons are entitled to register in the *"jurisdictions"* in which they reside. Lee was not a resident of the city of Pacific at the time of his registration, thus under §§ 115.135.1 and 115.139 Lee was not a "legal voter," *see* § 1.035, and should not have been permitted to vote at the city election of April 5, 1988. Finally, as noted above, Mo. Const. art. VIII, § 2, mandates that before Lee could have been entitled to vote he had to be a resident of the political

---

4. These voters are Kathy Mann, Georgia Robnett, William Lynn, Doritt Graub, Raymond Yandell, Barbara Watters, Betty Ann Schaffer, Keith Muehler, and Melanie Lee Schulte.

subdivision in which he offered to vote and properly "registered within the time prescribed by law." Lee was not a resident of the city when he falsely registered there, and when he moved there shortly before the election he did not or could not take any steps to properly register under the law.

The judgment of the trial court is affirmed and the cause remanded for the purpose of setting the date for a special election.

ROBERTSON, COVINGTON and BILLINGS, JJ., concur.

HIGGINS, J., dissents in separate opinion filed.

BLACKMAR, C.J., and WELLIVER, J., dissent and concur in separate dissenting opinion of HIGGINS, J.

HIGGINS, Judge, dissenting.

With due respect for the principal opinion, I find myself in dissent. I would reverse the judgment of the trial court because the sole ground for the new election there ordered is voter qualification, a matter not subject to collateral attack in an election contest proceeding under section 115.553.1, RSMo 1986. *Whitener v. Turnbeau*, 602 S.W.2d 890 (Mo.App.1980); *Gasconade R–III School Dist. v. Williams*, 641 S.W.2d 444 (Mo.App.1982).

In this opinion, I draw freely from the opinion of the Honorable Kent E. Karohl for the Missouri Court of Appeals, Eastern District.

The trial court found 11 voters were ineligible to vote because they did not reside within the city on election day. The trial court said in the judgment, "[t]he irregularities which cause the court to enter this new election consist solely of votes cast by persons in the initial election who were not qualified to vote therein.... In order to

be qualified to vote at an election the voter must be a *resident* of the voting precinct where he attempts to vote, and he must be *registered* to vote in that precinct...."

In a footnote to the judgment the trial court found, in general, that the voters found ineligible are not aware of any wrongdoing on their part. The footnote comment also recognized the "court could not and did not attempt to determine for whom the contested voters actually cast their ballot, however, the law must assume in this lawsuit that all voted for the winner when that may very well not be a true assumption." It is not necessary to decide whether that assumption is valid.

The judgment of the trial court erroneously applied the law regarding election contests where the issue is voter qualifications, *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), because the judgment of the trial court is at odds with *Whitener* and *Gasconade R–III School Dist.* *Whitener* was a case of first impression under the Comprehensive Election Act of 1977 involving whether under Missouri law voters' qualifications may be challenged judicially in an election contest. The court held that the trial court correctly decided that such qualifications may not be challenged as "irregularities" under the authority of section 115.553.1, RSMo 1986, and that the trial court was not authorized by statutory authority to consider voter qualification as a ground to order a new election. In *Gasconade R–III School Dist.*, the court held that the trial court properly found it lacked authority to determine absentee voter qualification in an election contest based on asserted "irregularities."[1] Therefore *Whitener* and *Gasconade R–III School Dist.* provide a legal basis to reverse the present judgment, and there is additional support for that result.

First, various sections of the Comprehensive Voting Act of 1977 indicate qualification of a voter is not a contest "irregulari-

---

1. In affirming the trial court's order of a new election, the court agreed that absentee voters' failure to execute the statutory ballot envelope affidavit coupled with confusing instructions on the official ballot did constitute irregularities to warrant a new election.

ty." Section 115.577, RSMo 1986, provides procedural guidance where the contest involves a municipal office. It sets a time limit and describes the function of the petition. Section 115.579, RSMo 1986, describes the procedure to be followed after the petition is filed and before a hearing. Section 115.581, RSMo 1986, directs the court to proceed immediately to try the case after the filing of a petition and answer. Section 115.583, RSMo 1986, requires the court to order "a recount of all votes brought in question by the petition or its answer" if it "finds there is a prima facie showing of irregularities which would place the result of any contested election in doubt...." The authority to contest relates to "irregularities [which] occurred in the election." § 115.553.1, RSMo 1986. Under section 115.583, RSMo 1986, the irregularities to support a contest are those that may be discovered during a mandated recount. Obviously, voter qualifications are not such irregularities because they are not discoverable during the required recount process. An examination of ballots, the function of a recount, will not shed any light on voter qualifications. This suggests that the irregularities that may be alleged under section 115.553.1, RSMo 1986, and would justify, if proven, a recount and a possible new election, do not include voter qualifications or registration. This is true irrespective of whether registration is considered a qualification in addition to qualifications described in section 115.133, RSMo 1986.

Second, the Comprehensive Election Act of 1977, chapter 115, RSMo 1986, provides procedures for preventing an unqualified or unregistered voter from voting. The qualifications of a voter are set forth in section 115.133.1, RSMo 1986. Qualifications for registration are set forth in section 115.135, RSMo 1986. Initially, the voter registration process will determine qualifications and residency. The statute requires registration to be completed not later than the fourth Wednesday prior to an election. § 115.135, RSMo 1986. This allows an interval for a candidate or others

to determine facts regarding qualifications of registered voters. The identity or qualifications of any person offering to vote may be challenged before the vote is cast. § 115.429.2, RSMo 1986. Registered voters, and others, may make such challenge, and no ballot will be presented to a voter "until his identity and qualifications have been established." § 115.429.2, RSMo 1986. Subsequent subsections of section 115.429, RSMo 1986, set forth a procedure for election judges to determine qualifications and registration, subject to immediate appeal to the circuit court by either the voter or election officials. As a result of these provisions, qualifications and registration of a voter are not free from question, but under the statutory scheme the challenge is to be made before, not after, a vote is cast. The statute does not expressly provide for collateral attack on grounds of lack of qualification or currency of registration, and in the absence of statutory authority, there is no authority to contest an election. *Wells v. Noldon,* 679 S.W.2d 889, 890 (Mo.App.1984).

Contestant–Respondent Marre argues that section 115.583, RSMo 1986, is an express authorization to challenge individual votes. He contends such challenge of votes is different, in some way, from challenging qualifications of voters, a procedure excluded by *Whitener v. Turnbeau,* and cases cited. This contention fails because section 115.583, RSMo 1986, does not purport to define the irregularities that will support a challenge to votes or an order for a recount. The procedural section does not address voter qualification. Already noticed is that section 115.583, RSMo 1986, relates only to such irregularities as may be discernible during a recount which *"shall"* be ordered if the court finds the contested election in doubt. Voter qualifications, however, are not irregularities that may be discovered during a recount. The provisions of section 115.583, RSMo 1986, are not in conflict with the holding in *Whitener.*

It is inescapable that this election contest proceeding invoked and limited itself to the

provisions of section 115.553.1, RSMo 1986, a part of the Comprehensive Election Act of 1977. Its only interpretations, *Whitener* and *Gasconade R–III School Dist.*, determined that voter qualifications are not subject to collateral challenge as "irregularities" in a proceeding under that section. The same situation exists in this case. In my opinion, the principal opinion strays from the limited question presented by this proceeding under section 115.553.1, apparently to find a "spirit" elsewhere in chapter 115 and to overrule *Whitener* as violative of that spirit. I submit that both *Whitener* and *Gasconade R–III School Dist.* are consistent with the scheme, purpose and spirit of the Comprehensive Election Act of 1977.

I submit, also, that the General Assembly has noticed the 1980 *Whitener* and the 1982 *Gasconade R–III School Dist.* decisions and has not amended the Act with respect to those interpretations and applications of section 115.553.1. The statute as thus interpreted has continued in force without change and this Court must presume that the General Assembly is satisfied with the statute as so construed. *State ex rel. Howard Electric Cooperative v. Riney*, 490 S.W.2d 1 (Mo.1973); 73 Am Jur.2d *Statutes*, § 322.

Accordingly, I would apply *Whitener* and *Gasconade R–III School Dist.* to the limited question in this case and reverse the judgment of the trial court ordering a new election.